IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

TINA MARIE PETERS,

        Plaintiff,

vs.                                      No.  10cv1034 DJS

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

<u>MEMORANDUM OPINION</u>

**THIS MATTER** is before the Court on Plaintiff's (Peters's) Motion to Reverse and/or

Remand Administrative Agency Decision **[Doc. No. 10]**, filed on March 14, 2011, and fully

briefed on May 2, 2011.[1]  On March 11, 2010, the Commissioner of Social Security issued a

final decision denying Peters's claim for disability insurance benefits and supplemental security

income payments.  Peters seeks judicial review of the Commissioner's final decision pursuant to

42 U.S.C. § 405(g).  Having considered the arguments, pleadings, administrative record, relevant

law, and being otherwise fully informed, the Court finds that the motion to remand is not well

taken and will be **DENIED**.

### I.  Factual and Procedural Background

Peters, now forty-one years old (D.O.B. September 15, 1969) filed her application for

disability insurance benefits and supplemental security income payments on January 7, 2008.

(Tr. 113, 117).  Peters was thirty-five years old at that time she alleges she became disabled on

---

[1] The Court's Briefing Order (Doc. No. 9) directed Plaintiff to file a reply by June 6, 2011, if she wished to do so.  Plaintiff did not file a reply and the parties have not filed a Notice of Completion.  Nonetheless, the Court assumes the motion is fully briefed.

August 2, 2005 (Tr. 14), due to fibromyalgia, a thyroid condition, and back, neck, arm, and hand pain.  Tr. 289.  Peters's insured status for disability insurance benefits expired on December 31, 2009.  Therefore, Peters must establish that she was disabled on or before that date.  *See Henrie v. United States Dep't of Health & Human Servs.*, 13 F.3d 359, 360 (10th Cir. 1993).  Peters has a high school education and has past relevant work as an office manager, bookkeeper, auditor, and staffing coordinator.  Tr. 137.

On March 11, 2010, the ALJ denied benefits, finding Peters was not disabled as she retained the residual functional capacity (RFC) to perform a full range of less than sedentary work with the following limitations:  She is limited to work that involves making only simple work related decisions with few work place changes, and limited to work that requires no production rate pace.  Tr. 17.  The ALJ further found Peters's "statements concerning the intensity, persistence and limiting effects of [her alleged symptoms] [are] not credible to the extent they [were] inconsistent with the residual functional capacity assessment."  Tr. 20.  On August 26, 2010, the Appeals Council denied Peters's request for review of the ALJ's decision. Tr. 1-3.[2]  Hence, the decision of the ALJ became the final decision of the Commissioner for judicial review purposes.  Peters seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

---

[2] Peters submitted six exhibits to the Appeals Council.  Tr. 4.  "[N]ew evidence submitted to the Appeals Council becomes part of the administrative record to be considered when evaluating the [Commissioner's] decision for substantial evidence."  *Threet v. Barnhart*, 353 F.3d 1185, 1191 (10th Cir. 2003).

## II.  Standard of Review

The standard of review in this Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether she applied correct legal standards. *Hamilton v. Secretary of Health and Human Servs.,* 961 F.2d 1495, 1497-98 (10th Cir. 1992). Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994).  "Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion."  *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992).  Moreover, "all of the ALJ's required findings must be supported by substantial evidence," *Haddock v. Apfel,* 196 F.3d 1084, 1088 (10th Cir. 1999), and all of the relevant medical evidence of record must be considered in making those findings, *see Baker v. Bowen*, 886 F.2d 289, 291 (10th Cir. 1989).  "[I]n addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects."  *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996).  Therefore, while the Court does not reweigh the evidence or try the issues de novo, *see Sisco v. United States Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993), the Court must meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings, in order to determine if the substantiality test has been met.  *See Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).

"'The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence.'" *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007)(quoting *Zoltanski v. F.A.A.*, 372 F.3d 1195, 1200 (10th Cir. 2004)).  The court "may not 'displace the agenc[y]'s choice between two fairly

conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo.'" *Id.* (quoting *Zolantski*, 372 F.3d at 1200).

### III.  Discussion

In order to qualify for disability insurance benefits or supplemental security income, a claimant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve months which prevents the claimant from engaging in substantial gainful activity.  *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993)(citing 42 U.S.C. §423(d)(1)(A)).  The regulations of the Social Security Administration require the Commissioner to evaluate five factors in a specific sequence in analyzing disability applications. 20 C.F.R. § 404.1520 (a-f).  The sequential evaluation process ends if, at any step, the Commissioner finds the claimant is not disabled.  *Thompson*, 987 F.2d at 1487.

At the first four levels of the sequential evaluation process, the claimant must show she is not engaged in substantial gainful employment, she has an impairment or combination of impairments severe enough to limit her ability to do basic work activities, and her impairment meets or equals one of the presumptively disabling impairments listed in the regulations under 20 C.F.R. Part 404, Subpt. P, App. 1, or she is unable to perform work she had done in the past. 20 C.F.R. §§ 404.1520 and 416.920.  At the fifth step of the evaluation, the burden of proof shifts to the Commissioner to show the claimant is able to perform other substantial gainful activity considering her residual functional capacity, age, education, and prior work experience. *Id.*

In support of her motion to reverse and remand, Peters makes the following arguments: (1) the ALJ erred at step 2 of the sequential evaluation process when the ALJ failed to consider all of Peters's impairments and complaints; (2) the ALJ erred at step 3 of the sequential

evaluation process when the ALJ failed to find that she meets Listing of Impairments 12.04; (3) the ALJ failed to accord her treating physicians' opinion the proper weight; (4) the ALJ's credibility determination is not supported by substantial evidence; (5) the ALJ's RFC finding is unsupported by substantial evidence and legally erroneous; and (6) the ALJ's hypothetical questions to the vocational expert (VE) failed to include all of her non-exertional limitations.

## A.  ALJ's Step Two Findings

Peters argues the ALJ erred at step two "by omitting fibromyalgia as a 'severe' impairment."  Pl.'s Mem. Support Mot. Reverse at 6.   The ALJ found Peters had severe impairments of degenerative disc disease of the cervical and lumbar spine and depression. "Under the regulations, once an ALJ finds that a claimant has at least one severe impairment, he does not err in failing to designate other disorders as severe at step two, because at later steps the agency will consider the combined effect of all of [claimant's] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity."  *Barrett v. Astrue*, 340 Fed.App'x 481 (10th Cir. 2009)(quoting 20 C.F.R. § 404.1523 and § 416.945(e)). Accordingly, this argument is without merit.

Peters also contends the ALJ erred at step 2 by failing to inquire further about her carpal tunnel syndrome and how it affected her use of her hands.  Pl.'s Mem. Support Mot. Reverse at 6.  Peters contends "she told the ALJ that she has carpal tunnel" and "previously informed the Commissioner that she uses splints on her hands at night."  *Id.* at 5.  Specifically, Peters argues "the judge has a duty to develop the record by fleshing out details of impairments that the claimant reports" and "the ALJ failed to ask sufficient questions to fulfill her duty to develop the record."  *Id.* at 5.  However, Peters bears the burden of proving disability.  *See Hawkins v. Chater*, 113 F.3d 1162, 1164 (10th Cir. 1997).  Peters was represented by counsel at the

administrative hearing and had the opportunity to develop Peters's testimony regarding her carpal tunnel. *See id.* at 167("Further, when the claimant is represented by counsel at the administrative hearing, the ALJ should ordinarily be entitled to rely on the claimant's counsel to structure and present claimant's case in a way that the claimant's claims are adequately explored.").

Moreover, Dr. Russo, Peters's treating physician, recorded the following Addendum to his February 2, 2007 medical notes:

> Not mentioned in the text previously but she also complained of tingling in her hands and apparently at one time, **consideration was raised to the possibility of carpal tunnel**. **She was given bilateral wrist splints** and I also referred her to neurology for EMG nerve conduction study with follow up based on the outcome of these studies.

Tr. 210. Thus, Dr. Russo provided Peters with wrist splints before he ever definitively diagnosed her with carpal tunnel. On February 23, 2007, Peters returned for her follow up. Dr. Russo's medical notes indicate as follows:

> PLAN: Continue with current care. We also talked about her arms. She has had some tingling in her hands and for this reason saw Dr. Harris for an evaluation of possible carpal tunnel. **Fortunately, her study was not particularly suggestive of carpal tunnel**.

Tr. 206. Dr. Russo did not restrict Peters's activities. In fact, Dr. Russo "encouraged [Peters] to be as active as her body will allow, particularly with the upper extremities, shoulders, and neck area." *Id.*

**B. Step Three Finding**

Peters contends the ALJ erred when she failed to find that she met Listing 12.04. The Court disagrees. In her decision, the ALJ noted:

> A psychiatric consultation examination dated September 23, 2008, by Cathy L. Simutis, Ph.D., indicated the claimant reported she was diagnosed with depression

6

six months ago by Dr. James Russo.  She stated she was taking a generic medication equivalent to Celexa, which she found helpful **and that she has had no other treatment**. The claimant reported she was taking Levothyroid, Methadone, Oxycodone, Soma, Ambien, Gabapentin, and Celexa.  The claimant reported she did not have any problems remembering to take medications.  She stated she thought her depression began about eight years ago.  Mental status exam revealed the claimant was alert and oriented; she maintained good eye contact and appeared cooperative; her rate and tone of speech were within normal limits; there were no indications of psychotic thoughts processes; she denied hallucinations, suicidal ideation and homicidal ideation; her affect during the interview appeared depressed; her gross intelligence appeared to be in the average range; her insight and judgment appeared adequate.  Prognosis revealed the claimant's depression appeared to have been exacerbated by her physical problems.  Her ability to understand and remember instructions appeared to be **moderately** limited.  Her ability to interact with coworkers and the public appeared to be **moderately** limited.  Her ability to adapt to changes appeared to be mildly limited.  Her current Global Assessment functioning (GAF) was reported to be 50.

Tr. 20 (emphasis added)(citing to Dr. Simutis's consultative report at Tr. 284-286).  Peters complains that the ALJ "incorrectly states that [she] has had no other treatment for depression besides medication.  She then contradicts herself in stating, 'This year she was seeing a counselor every week.'"  Pl.'s Mem. Support Mot. Reverse at 10.  Peters is mistaken.  Dr. Simutis's performed her consultative evaluation on September 28, 2008.  Peters did not go to Rio Grande Counseling & Guidance  Services until January 7, 2009.  Tr. 323 (Rio Grande Counseling Intake Assessment).  Accordingly, the ALJ correctly noted Peters was not receiving any other treatment for her depression at the time of Dr. Simutis's evaluation.  Notably, the Intake Assessment performed at Rio Grande Counseling indicates the evaluator accorded Peters a "current GAF score of 65."[3]  Moreover, on February 9, 2009, Peters saw a physician assistant

---

[3] Global Assessment of Functioning score is a subjective determination which represents "the clinician's judgment of the individual's overall level of functioning.  American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders 32 (Text Revision 4th ed. 2000) (DSM-IV-TR).  The GAF Scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death.).  DSM-IV-TR at 34.

for management of her thyroid medication.  On that day, Peters reported that her depression was stable.  Tr. 361.

Additionally, on October 1, 2008, Scott R. Walker, M.D., a nonexamining agency consultant, completed a Mental Residual Functional Assessment and made the following findings: **moderately** limited in the following five areas: (1) the ability to understand and remember detailed instructions; (2) the ability to carry out detailed instructions; (3) the ability to maintain attention and concentration for extended periods; (4) the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and (5)  the ability to respond appropriately to changes in the work setting.  Tr. 287-288.  Dr. Walker also noted:"[Peters] cam understand, remember and carry out detailed but not complex instructions, make decisions, attend and concentrate for two hours at a time, interact adequately with coworkers and supervisors and respond appropriately to changes in a work setting."  Tr. 289.

Dr. Walker also completed a Psychiatric Review Technique form.  Tr. 291-304.  Dr. Walker assessed Peters under Listing 12.04 (Affective Disorders) and opined she was **__mildly__** restricted in Activities of Daily Living and **__mildly__** limited in maintaining social functioning but **moderately limited** in maintaining concentration, persistence or pace.  Tr. 301.  Dr. Walker further found Peters had no episodes of decompensation and opined the evidence did not establish the presence of the "C" criteria.

The records from Rio Grande Counseling & Guidance Services are consistent with the opinions of Drs. Walker and Simutis.  At intake, the evaluator assessed Peters as depressed and noted Peters was neat in appearance, made fair eye contact, was oriented in all spheres, her affect was appropriate, her cognitive thought process was logical, her perception was normal, her

insight fair, her judgment fair, her impulse control fair, and she had no suicidal or homicidal ideation.  Tr. 331.  The evaluator accorded Peters a GAF score of 65 which indicates some mild symptoms.  *Id.*  The counseling progress notes also do not support a finding that Peters meets Listing 12.04.  Tr. 307-320.  Thus, Peters's assertion that the record "supports a finding of 'marked' limitation in the first three (3) domains" is not supported by the record.  Accordingly, the Court finds that substantial evidence supports the ALJ's finding that Peters did not meet Listing 12.04.

## C.  Treating Physician Opinion

Peters argues that "one of the impairments for which [her] treating physicians constantly follow her is fibromyalgia," and "her treating physicians **endorse** a diagnosis of fibromyalgia." Pl.'s Mem. Support Mot. Remand at 11(emphasis added).  Consequently, Peters argues the ALJ erred when she noted, "The claimant testified she had fibromyalgia, but the medical evidence does not contain any biopsies or nerve conductions (sic) studies performed to definitely prove or disapprove (sic) this."[4]  Tr. 21.  Peters contends the ALJ "parroted" Dr. Burger's report where he noted, "The fibromyalgia is questionable, she does not have any biopsies or nerve conduction studies performed to definitely prove or disprove this phenomenon."  Tr. 242.  Peters contends "Dr. Burger is in no position himself to comment about whether biopsies have been taken from

---

[4] This statement is correct.  There were no " biopsies or nerve conduction studies" in the record.  Fibromyalgia is a diagnosis of exclusion.  In most cases, laboratory testing appears normal. Generally, a history, physical examination, laboratory work, x-rays, electrical nerve and muscle testing (electromyography (EMG)), and or nerve conduction velocity (NCV) may be performed to rule out other disorders such as hypothyroidism, muscle, bone, nerve, or joint disease, anemia, rheumatoid arthritis, or hormonal imbalance.  A definitive diagnosis of fibromyalgia syndrome is made only when no other medical disease can explain the symptoms. An individual with fibromyalgia will be sensitive to pressure in certain areas of the body called tender points.  The fibromyalgia patient will have at least 11 of the 18 specified tender points of fibromyalgia. www.fibromyalgia-symptoms.org/fibromyalgia_diagnosis.html

[her] or whether nerve conduction studies have been conducted." *Id.*   Peters contends the ALJ

failed to give her treating physicians' opinions any weight but fails to identify any specific

medical opinion or opinions supporting disability.

The opinion of a treating physician concerning the nature and extent of a claimant's

disability is entitled to "controlling weight" when it is "well-supported by medically acceptable

clinical and laboratory diagnostic techniques" and is "not inconsistent with the other substantial

evidence in [the claimant's] case record."  20 C.F.R. §§ 404.1527(d)(2).  However, an ALJ may

disregard a treating physician's opinion if it is not so supported.  *Castellano v. Sec'y of Health &*

*Human Servs.*, 26 F.3d 1027, 1029 (10th Cir. 1994).  "When an ALJ decides to disregard a

medical report by a claimant's physician, he must set forth specific, legitimate reasons for his

decision."  *Drapeau v. Massanari*, 255 F.3d 1211, 1213 (10th Cir. 2001).  Nonetheless, "[i]n

choosing to reject the treating physician's assessment an ALJ may not make speculative

inferences from medical reports and may reject a treating physician's opinion outright only on

the basis of contradictory medical evidence and not due to his . . . own credibility judgments,

speculations or lay opinion."  *McGoffin v. Barnhart*, 288 F.3d 1248, 1252 (10th Cir.

2002)(quotations and italics omitted).

"Even if a treating physician's opinion is not entitled to controlling weight, '[t]reating

source medical opinions are still entitled to deference and must be weighed using all of the

factors provided in [§]404.1527.'"  *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir.

2003)(quoting Social Security Ruling 96-2p, 1996 WL 374188, at *4).  Moreover, a treating

physician's opinion that a claimant is totally disabled is not dispositive "because final

responsibility for determining the ultimate issue of disability is reserved to the [Commissioner]."

*Castellano,* 26 F.3d at 1029.

In this case, Peters's treating physicians never diagnosed her with fibromyalgia or opine that she was disabled.  The record indicates Dr. Russo diagnosed Peters with chronic low back and neck pain.  *See* Tr. 217 (11/22/2005 visit– (1) severe hypothyroidism; (2) chronic low back pain; (3) seasonal allergies; (4) hypertension); Tr. 215 (12/2/2005 visit– (1) profound hypothyroidism; (2) chronic back pain); Tr. 213 (12/30/2005 visit– hypothyroidism); Tr. 211 (9/8/2006 visit– (1) chronic low back pain; (2) seasonal allergies; (3) hypothyroidism); Tr. 206 (2/23/2007 visit– "myofascial back pain and best long-term solution for her to develop an aerobic exercise program); Tr. 204, 224 (11/26/2007 visit– chronic low back and neck pain; Pain Clinic assessment 3 years prior indicated pain myofascial in character & MRI did show some degenerative disc disease at the L4-L5 level at that time, but it was not a profound disk space narrowing, even less prominent findings were identified in the cervical spine; other problems include hypothyroidism, seasonal allergies and a history of cataracts, secondary to trauma); Tr. 254 (6/1/2008 visit– depression, much of it secondary to chronic pain); Tr. 256, 370 (4/22/2008 visit– chronic pain in the axial spine, depression, and hypothyroidism); Tr. 368 (6/10/2008 visit– depression, but of it secondary to chronic pain).

It was not until March 17, 2008, when Peters saw Michael Malizzo, M.D., for a clinic consultation at Dr. Russo's request, that fibromyalgia was mentioned.  Tr. 282.  Dr. Malizzo noted, in pertinent part:

> TREATMENTS: The patient has been seen in the Pain Clinic previously by Dr. Culling.  This was in 05/2004.  He felt most of her symptoms **at that point** were due to a **"fibromyalgia-type picture**."  He recommended exercise and referred her to our psychologist, Dr. Klein.  The patient has been working with Dr. Ernest Dole most recently with medication management.  She is on methadone, oxycodone, Soma, and gabapentin.  She has been through physical therapy in the past, but does not demonstrate much in the way of home exercise program.  She did have treatments with Dr. Gelinas around the late 1990s, early 2000.  He did facet injections in the lumbar spine, which gave her about two weeks relief.  She also had

an IDET procedure, which was somewhat beneficial.   Acupuncture was of no benefit.  Chiropractic care seemed to exacerbate things.

**PAST** MEDICAL HISTORY: Significant for hypothyroid disorder, fibromyalgia and being overweight.

Tr. 281.  Dr. Malizzo diagnosed Peters with (1) cervical spondylosis without myelopathy; (2) cervical disk displacement without myelopathy; (3) lumbar spondylosis without myelopathy; and (4) myofascial pain secondary to the above diagnoses.  Dr. Malizzo set Peters up for a cervical epidural steroid injection and physical therapy.  Dr. Malizzo noted he would follow up in several weeks with medial branch blocks of the lumbar spine.  Other than listing fibromyalgia in Peters's  past medical history, Dr. Malizzo did not assess Peters as having fibromyalgia.  *See also* Tr. 279 (4/2/2008 visit– Dr. Malizzo assessed Peters with (1) cervical spondylosis without myelopathy and (2) cervical disc displacement without myelopathy and administered a cervical epidural steroid injection.); (4/16/2008 visit– Dr. Malizzo assessed Peters with lumbar spondylosis without myelopathy); Tr. 277 (4/30/2008 visit– same); Tr. 275 (6/4/2008 visit– same); Tr. 273 (7/7/2008 visit– Dr. Malizzo assessed Peters with lumbar spondylosis without myelopathy and lumbar disc displacement without myelopathy); Tr. 271 (7/10/2008 visit– same); Tr. 356 (4/9/2009 visit– (1) cervical spondylosis without myelopathy and (2) cervical disk displacement without myelopathy); Tr. 351 (6/11/2009 visit– same); Tr. 346 (8/6/2009 visit–  lumbar spondylosis without myelopathy and lumbar disc displacement without myelopathy);Tr. 339 (10/1/2009 visit– (1) cervical spondylosis without myelopathy and (2) cervical disk displacement without myelopathy).

On April 9, 2008, David P. Green, M.D., a nonexamining agency consultant, completed a Physical Residual Functional Capacity Assessment.  Tr. 243-250.  Dr. Green assessed Peters with cervical and lumber degenerative disk disease, hypothyroidism, chronic myofascial pain

and obesity.  Tr. 243.  Dr. Green opined Peters could occasionally lift and/or carry 20 pounds,

frequently lift and/or carry 10 pounds, stand and/or walk for about 6 hours in an 8-hour workday,

and push and/or pull, unlimited.  Tr. 244.  Dr. Green further found Peters could occasionally

climb, balance, stoop, kneel, crouch, and crawl; was limited in her ability to reach in all

directions and had no visual or communicative limitations.  Tr. 245- 247.  Dr. Green also

advised that Peters avoid concentrated exposure to extreme cold and heat and hazards

(machinery, heights, etc.).  Tr. 247.  Dr. Green noted:

> The claimant has been followed by her PCP for hypothyrodism and chronic low back
> pain.  When seen on 2/2/07 she wasw on methadone, Soma, oxycodone, and
> Levothyroxine.  She is also followed by a pharmacist (Dr. Dole) for pain med
> management.  On 11/26/07 she was referred to pain clinic.  When seen by the
> pharmacist 1/15/08 she reported that the pain meds were working but she was
> interested in increasing her gabapentin.  Pain was in her neck and shoulders but also
> runs down her arms.
>
> The claimant had a CE (consultative examination) with Dr. Burger on 3/22/08:
>
> 67" 195 pounds 146/96
> Gait was normal.  She moved about the office without difficulty.  There was some
> decreased cervical lordosis and increase in thoracic kyphosis.  There was no
> paraspinal muscle tenderness or spasm.  Cervical spine had normal movement.  The
> neurologic exam was non-focal.

Tr. 245.  Peters argues that "[g]iven that Dr. Green has had absolutely no contact with [her]

whatsoever and his opinion is inconsistent with the record as a whole, it should be given no

weight in light of the treating physician rule."  Pl.'s Mem. Support Mot. Remand at 13 (emphasis

added).

However, under the regulations, State agency expert opinions "must be treated as expert

opinion evidence of a nonexamining source."  SSR 96-6p, 1996 WL 374180, at *1.  Like

opinions by nontreating sources, the ALJ "may not ignore these opinions and must explain the

weight given to these opinions in their decisions."  *Id.*  However, "the opinions of State agency

medical and psychological consultants . . . can be given weight only insofar as they are supported by evidence in the case record . . . ." *Id.* at 2.

Essentially, Peters argues that because the ALJ discounted her "diagnosis" of fibromyalgia her case must be remanded.  However, an individual is not considered to be disabled under the Social Security Act unless her "physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).  Therefore, "the operative question for disability benefits under the Act is **whether [p]laintiff experiences functional limitations due to her impairments**.  Regardless of whether plaintiff could have been diagnosed with a particular medical condition, none of the consultative physicians found her to have functional impairments which precluded the performance of all work during the relevant period."  *Gardner-Renfro v. Apfel*, 2000 WL 1846220 at *4 (10th Cir. Dec.18, 2000)(unpublished)(emphasis added).

In this case, the record indicates Peters's functional impairments due to her pain did not preclude the performance of all work.   Dr. Ernest Dole, Pharm.D. (Doctor of Pharmacy) and Dr. Malizzo managed Peters' s pain.  The record shows that Peters's pain was manageable and generally stable.

On July 30, 2007, Dr. Dole evaluated Peters's medication for pain control.  Tr. 230-231. Peters was on methadone, oxycodone, and Soma at that time.  Dr. Dole noted:

> SUBJECTIVE: Using the Visual Analog Scale to assess the intensity of pain 1-10 with current medications, the patient states 4, which is the same as previous appointment.  Does state that last week her back locked up for about a week.  No side effects, sleep is without change, and overall satisfied with the level of pain

control and wishes no change.  The patient does state she is trying to go to the gym and walk her dogs in order to get more exercise.

ASSESSMENT: The patient in clinic today for evaluation of medication for pain control.  Pain control is stable.  We will make no changes.  The patient appeared to understand and agreed.  Agreed to take medications only as prescribed.

Tr. 230 (emphasis added).

On August 31, 2007, Dr. Dole evaluated Peters's medication for pain control.  Tr. 228-229.  Dr. Dole noted:

SUBJECTIVE: Using the Visual Analog Scale to assess the intensity of pain 1-10 with current medications, the patient states 4-6/10 with her medicines, which unchanged from previous appointment.  No side effects.  Sleeps for 6-8 hours at night and wakes up with a little bit of pain.  As far as exercise, she did try yoga once, but that hurt her and she quit, but she does walk her dogs every day.  Pain feels like a knife digging into her right lower back, but overall, the patient is doing well, which is not changed.

ASSESSMENT: The patient in the clinic today for evaluation of medication for pain control.  Pain control is stable.  We will make no changes.  The patient appeared to understand and agreed to take medication only as prescribed.

Tr. 228 (emphasis added).

On November 21, 2007, Dr. Dole evaluated Peters's medication for pain control secondary to neck and low back pain.  Tr. 226.  Dr. Dole noted:

SUBJECTIVE:   The patient states she has been doing okay with the pain management well.  Does do some volunteer work.  When the day is done, she does have more pain.  Using a Visual Analog Scale to assess the intensity of pain, 1-10, with current medications, the patient states 3-4/10, which is similar to previous appointments.  States sleep has been okay.  State that her hip does go numb at night and she uses a body pillow for positioning, which does help.  No side effects from any of her medications.  Pain is adequately controlled and wishes no changes.  Of note, the patient though has not really started an exercise program.

Assessment: The patient in clinic today for evaluation of medication for pain control.  Pain control is stable.  We will make no changes.

Tr. 226 (emphasis added).

On January 15, 2008, at Dr. Russo's request, Dr. Dole evaluated Peters for "pain control secondary to lower back pain and neck pain." Tr. 222-223. On that day, <u>Peters reported her pain was 5 on a scale of 10</u>. Peters reported her back pain was OK and "the <u>pain meds are working</u>, but is interested in increasing her gabapentin (pain medication)." Tr. 222. Peters complained mostly of the pain in her neck and shoulders and complained she couldn't do "a whole lot without this pain flaring up." *Id.* Dr. Dole increased her gabapentin dosage and directed Peters to return for a follow up in one month.

On February 12, 2008, Peters returned to see Dr. Dole for evaluation of her medication for pain control secondary to lower back pain and neck pain. Tr. 377-378. Dr. Dole noted:

> SUBJECTIVE: Using a Visual Analog Scale to assess <u>the intensity of pain, 1-10, with current medications, the patient states 6/10, which is actually higher than previous appointments</u>. This is in lower back, neck, left shoulder, and arm pain. It is a burning and stabbing pain with arm numbness. It is a tingling pain. Lifting increases the pain and medication decreases the pain. The patient also has a tooth infection. She is on clindamycin and that also seems to have increased the pain. The patient did ask about depression and she was tearful when she talked about her son who I guess brought to see a psychiatrist and the psychiatrist who is seeing her son suggested she follow up with her PCP or me regarding starting Cymbalta for her depression. The patient does feel she is depressed, but not suicidal. <u>As far as the pain control, the patient is doing well</u>.

> ASSESSMENT: The patient in clinic today for evaluation of medication for pain control. <u>Pain control is stable</u>. We will make no changes. I did ask patient to follow up with her PCP regarding her depression and that there does seem to be more of undercurrence (sic) and well probably be appropriate practice, agreement to start Cymbalta for pain. I think at this point in time, it would be better for the patient to see her primary care for further work up of depression and in the future also might be worthwhile for the patient to see Dr. Klein. The patient appeared to understand and agree.

Tr. 377.

On April 4, 2008, Dr. Dole evaluated Peters's medication for pain control. Tr. 264-265.

16

Dr. Dole noted:

> SUBJECTIVE: Using a Visual Analog Scale to assess the <u>intensity of pain, 1-10, with current pain [medication] patient states 3-4</u>, which she feels is secondary to her epidural from Dr. Malizzo. <u>No side effects.</u> Sleep is without change. <u>Overall, the patient is satisfied and will begin physical therapy also, but wishes no change in her pain medication</u>.

> ASSESSMENT: The patient in clinic today for evaluation of medication for pain control. <u>Pain control is stable and doing better with her epidural.</u> I did discuss the use of Lyrica. At this time, we will hold off one. <u>I wanted to see physical therapy actually helps her and exercise helps her fibromyalgia</u>. They will push gabapentin, if that does not work, we will move to Lyrica. The patient and her husband appeared to understand and agree.

Tr. 264-265. Dr. Dole directed Peters to return in 1-3 months.

On July 1, 2008, Dr. Dole evaluated Peters's medication for pain control. Tr. 262-263.

Dr. Dole noted:

> SUBJECTIVE: The majority of our time today was spent discussing miscommunication between the patient and her husband and the Lovelace Gibson Pharmacy. This was subsequently resolved, but their dissatisfaction and then resolution and current satisfaction was most of our appointment. She does however to my untrained eye looked less comfortable than previous appointments and it looks like she is fidgeting in the chair more and does state <u>she is in more pain since her radiofrequency ablation procedure last month</u>. Also, of note, the patient has played with her gabapentin. She has increased it to 600 mg 2 t.i.d. and this does seem to help her pain. So we will continue with that.

> Assessment: The patient in clinic today for evaluation of medication for pain control. We will increase gabapentin to 1200 mg 3 times a day and if that does not work, we will switch to Lyrica. I did suggest the patient follow up with Dr. Malizzo regarding the <u>increased pain after RFA procedure</u>. The patient appeared to understand and agree.

Tr. 262 (emphasis added). Dr. Dole directed Peters to return in 1-3 months for follow up.

On September 19, 2008, Peters returned for her follow up with Dr. Dole. Tr. 364-365.

Dr. Dole noted:

17

SUBJECTIVE: The patient states she still continues to get numbness and tingling in her hands and she has been having an increase in aching, dull pain in both her legs. She has shooting pain from her lower back to her thighs.  She has maxed out on gabapentin.  She is on 3.6 g per day and still is having neuropathic pain and wishes to try Lyrica and was worried about the cross titration from Lyrica to gabapentin, being uncovered during that time.  She sleeps 6-8 hours a night and does wake up 2 times a night due to pain.  During the interview, she has direct eye contact, using gaze in the conversation.  Her elbows are relaxed.  There is no miosis and her grooming is appropriate.

ASSESSMENT: The patient in clinic today for evaluation of medication for pain control.  At this time, the patient failed gabapentin, we will move to Lyrica.  We will begin Lyrica for 1 month to make sure that is on board before begin titrating gabapentin.  The patient appeared to understand and agree.

Tr. 364.  Dr. Dole directed Peters to return in one month.

On January 28, 2009, Peters returned for her follow up with Dr. Dole.  Tr. 362-363.  Dr.

Dole noted:

SUBJECTIVE: Using a Visual Analog Scale to assess the intensity of pain, 1-10, with current medications, the patient states really no change.  It still continues to be a sharp stabbing pain with burning, numbness and aching and muscle spasms.  She does state the pain wakes her up at night occasionally, but overall is doing well.  She feels the Lyrica is working better than gabapentin, would like to continue to wean off that and go only with Lyrica.

ASSESSMENT: Patient in clinic today for evaluation of medication for pain control secondary to lower back pain and neck pain.  At this point in time, we will make no changes except to discontinue her gabapentin and move to Lyrica only.  Also, there is a shortage of oxycodone, so instead of oxycodone 5 mg 2 q.i.d., we will go with Percocet 10/35.  The patient appeared to understand and agree.

Tr. 362 (emphasis added).

18

On **April 9, 2009**, Peters returned for her follow up with Dr. Dole.[5]  Tr. 357-358.  Dr. Dole

noted:

> SUBJECTIVE: Using a Visual Analog Scale to assess <u>the intensity of pain 1 to 10 with current medications, the patient states **1/10**</u>, which is less than previous appointments.  <u>She does state **her leg pains are rare** with the include of Lyrica and it really did decrease by significant amount.  The  patient does feel that current regimen is working and wishes no change.  Because of her increased pain control, she has increased her daily activities and is not able to play more with her 3-month-old granddaughter</u>.  We did give her a 3-month supply of her pain medicines.  She does put them in her medication lock box and she is having one of the key.  <u>The patient is doing well today, wishes no changes and having no adverse effects</u>.
>
> ASSESSMENT AND PLAN:
> 1.    The patient in clinic today for evaluation of chronic low back pain secondary to degenerative disc disease.  At this time, <u>the patient is doing well</u>.  We will make no changes.  We will fill opiates at appropriate time.
> 2.    The patient appeared to understand and agree.  Agreed to take medicines as prescribed.  Follow up with all scheduled appointments.  This is a 15-minute appointment, 100% patient counseling. The patient to return in 1-3 months.

Tr. 357(emphasis added).

On July 9, 2009, Peters returned for her follow up with Dr. Dole.  Tr. 349-350.  Dr. Dole

noted:

> SUBJECTIVE: Using a visual analog scale to assess <u>the intensity of pain 1-10 with current medications, the patient states 5/10</u>, which is higher than the 1/10 from

---

[5] Dr. Dole noted Peters "will see Dr. Malizzo today for injections."  Tr. 357.  In fact, Peters saw Dr. Malizzo later that day, but rated her pain a 6 on a 0-10 scale and reported different symptoms than she reported to Dr. Dole.  Tr. 355-356.  Dr. Malizzo noted:

> This patient returns to clinic today.  Her chief complaint is pain within the cervical spine, particularly left of midline through the left shoulder blade area and into the shoulder and little bit into the occipital part of her head.  She also has pain across the lumbosacral part of her spine again towards the left side into the buttock and hip area.  She also has some on the right side, but the left side is worse.  The patient is here today to repeat a cervical and lumbar epidural steroid injection.

Tr. 355.  Moreover, she did not list Lyrica as one of her medications.  Dr. Malizzo administered a lumbar epidural steroid injection.

previous appointment.  The patient does state it is difficult for her to rate the pain with all, which is interesting because the patient has never had any problems with that before.  She does state her neck pain causes a headache. She has shooting pain down her neck and arms and also from her hips to her legs, it is a stabbing pain.  She does state the injection with Dr. Malizzo will usually help and she scheduled an additional one; however, she has not seen the counselor she has seen before in the past and stated she did much better when she was in counseling.  She is having more pain and has increased her methadone by about 2 additional tablets a day and her oxycodone by an additional tablets on bad days and additional Soma.  She does feel the Lyrica has helped her leg pains but she has gained weight, but does not want to stop the Lyrica because of the weight gain.  She feels the pain medications are working okay, but states she is depressed and hurting all the time and she is hurting more because her daughter and her new baby are living with them and she is doing more work taking care of them.  She sleeps 6 hours a night and at this time is not satisfied with the level of pain control.

ASSESSMENT AND PLAN:
1.      The patient in clinic today for evaluation of medication for low back pain secondary to degenerative disk disease, did discuss with the patient the dangers of increasing opiates on her own including accidental overdose and death and the inappropriateness of it and the fact that we cannot give her early refills if she does do that.  Also, discussed with the patient that the purpose of her pain medication is to control her pain but not to mask her pain, so she can overwork and hurt herself and at this time, we will make no changes in her pain medications because I think that will lead to further problems down the road.

2.      Did discuss with the patient and the patient said as much at least twice on her own that she feels really the main problem now is she is not in counseling and the Behavioral Health support she had is gone and again rather than increasing opiates at this point in time would like her to get plugged into Behavioral Health System.  I did give her the list of providers in town and also asked to follow up with Dr. Ben Klein.

Tr. 349 (emphasis added).

On August 14, 2009, Peters returned for her follow up with Dr. Dole.  Tr. 344-345.  Dr.

Dole noted:

SUBJECTIVE: Using a Visual Analog Scale to assess the intensity of pain 1-10 with current medications, the patient does state 3-4 with her medication, which is less than her last appointment but still higher than previous appointment.  The worst she gets is 8/10, the best she gets is 2/10.  She does feel level of 3/10 is acceptable.  She does

20

feel the pain is interfering with her daily activities such as general activity, mood, enjoyment of life, relationships but does not quantify that. The pain is basically from the base of her neck down through her left shoulder, then also through her lumbar back area, down across her hips and down her legs. It is a deep, achy, sharp, shooting, stabbing pain, it is constant. She does have some numbness, tingling and muscle spasms associated with it. What makes the pain better is rest and medication. What makes it worse is activity, walking, standing and lying down. The patient does not have any loss of bladder control. Does not have any constipation, does complain of waking and feels that this be due to her Lyrica and also she has a history of hypothyroidism. She has not had any accidents, falls or injuries since her last appointment. She gets 6 hours of sleep at night, 2-3 hours uninterrupted. She wakes twice a night because of the pain and occasionally wakes feeling rested but has not had any work up for sleep apnea and she does feel her medications are working except for her Lyrica. The patient also still appears to have fair amount of stress with her daughter and that does seem to be impacting the pain control. The patient again did feel originally the Lyrica works but has questions about it and also has some worries about weight gain from it.

ASSESSMENT AND PLAN:
1.     The patient in clinic today for evaluation of medication for pain control secondary to low back pain secondary to disk disease. <u>At this time, the patient is stable as far as this aspect of her treatment, having no side effects and we will continue as is</u>. The patient needs no opiates at this time and will fill at the appropriate time.
2.     For fibromyalgia, we will try increasing her Lyrica to 150 mg t.i.d, prescription is written for #90 with 2 refills, but will watch her weight gain.
3.     For behavioral health, I did discuss with the patient the current stress between her daughter and certainly on care of her granddaughter and how that can impact on her pain control. I did strongly encourage the patient to follow up with Dr. Ben Klein and did re-give the patient a list of behavioral health specialists in town.
4.     I did discuss with the patient how pain could impact on her depression which can impact on her pain perception, intolerance and asked her to follow up with her primary care provider regarding that.
5.     I did discuss with the patient the value of a Sleep Clinic appointment, the connection between lack of sleep, depression, pain and risk of hypoventilation at night and did give the number of Sleep Clinic.
6.     The patient appeared to understand and agree, agreed to take medicines only as prescribed and follow up with all scheduled appointments.

Tr. 344-345.

On November 23, 2009, Peters returned to see Dr. Dole. Tr. 335-337. Dr. Dole noted:

SUBJECTIVE: Using a Visual Analog Scale to assess the intensity of pain 1 to 10 with current medications, the patient states 3-4/10 when her medications are on board. The worse it gets is 7-8/10 and the best it gets is 3-4/10. She feels a level of 2/10 would be acceptable. Does feel the pain is interfering with her life on a scale of 0-10, 0 being no interference in the past week, 10 being total interference in the past week. General activity is 5/10, mood is 4-5/10, enjoyment of life is 5/10 and relationships are 5-6/10. The pain is from her cervical spine and neck area down through her left shoulder and left arm and then from her lumbar spine across her hips and her left hip and then down through her right hip across her buttocks. Pain in her left hip is actually new. It is deep, achy, sharp, shooting, stabbing, burning and stinging pain. It is constant, intermittent and associated with numbness, tingling, weakness and muscle spasm. Medication help. Activity, sitting and standing makes it worse. The patient has no complaint of loss of bowel or bladder control. Has constipation, but feels it is being managed. She complains of weight gain. She does state she has gained about 8-10 pounds since starting the Lyrica. Also complained of memory problems, balance problems, coordination problems, feels that is due to her medications. It could also be due to her depression. Sleeps 6 hours a night, 2-3 hours of that is uninterrupted. Wakes 1-2 times at night due to the pain, sometimes feels rested. Does state that their new grandbaby sleeps in the bed with her husband and she has decreased her Ambien use, so that she could be more aware of the baby's needs. She does feel the pain medications are working for her. She has not been evaluated for sleep apnea. She does feel the Lyrica has decreased her fibroymalgia pain. She is in a process via her counselor moving from Celexa to **Cymbalta and does state that during this transition Saturday she felt "like a zombie"** and is waiting to see what happens with this transition, but is taking the medicines as directed. As far as her pain control, does feel that is doing well and wishes no change. She does state her counselor did ask her to ask questions about fentanyl and see if that would be a good choice for her.

CURRENT MEDICATIONS: Lyrica 150 mg two times a day, methadone 10 mg two 4 times a day, oxycodone 5 mg 4 times a day, Soma 350 mg q.i.d., levothyroxine 137 mcg a day, Ambien, Wellbutrin and Celexa, the patient in the process of moving of those and moving to Cymbalta.

ASSESSMENT AND PLAN:
1.      The patient in clinic today for evaluation of neck and lower back pain secondary to degenerative disk disease. At this time, the patient is stable, doing well. We will make no changes and will fill opiates at the appropriate time.
2.      The patient is to follow up with Dr. Malizzo early next month. Did ask her to make sure and do that to evaluate this new pain in her right hip. As for the patient's fibromyalgia, she is tolerating the Lyrica well. She has gained about 8 to 10 pound with that however and will follow that closely and hopefully as the patient moves to Cymbalta that may also help her pain.

3.      For behavioral health does seem like moving to Cymbalta is a good idea.  It could be however the patient feeling like "zombie" and being dizzy, may be due more to actually too much serotonin.  It could be too much norepinephrine secondary to Wellbutrin and Cymbalta.

4.      Did discuss with the patient the positives and negatives of moving to fetanyl.  I did discuss my feeling that the fentanyl is a fairly expensive drug.  The absorption varies from generic manufacturer to generic manufacturer because there are different systems.  I do think the skin absorbs the medicine more erratically than the stomach.  I think it is hard to titrate because you are locked into a 3-day timeframe and it may have the extra potential, this being more of a risk factor with a new baby in the house there is a more potent medication.

5.      Did discuss with the patient the connection between lack of sleep, hypoventilation depression, anxiety and especially fibromyalgia and pain control and did strongly encouraged the patient to make an appointment with the Sleep Clinic and did give the patient the clinic's number.

6.      The patient appeared to understand and agree.  Agreed to take medicines only as prescribed.  Follow up with all scheduled appointments.

Tr. 335-337 (emphasis added).  Dr. Dole noted, "Does rise from a sitting to standing position, does walk across the exam room without apparent difficulty."  Tr. 336.

Dr. Malizzo also assisted Peters in managing her pain.  On **March 17, 2008**, Dr. Malizzo evaluated Peters.  Tr. 281-283.  Dr. Malizzo noted, in part:

HISTORY OF PRESENT ILLNESS: The patient is a 38-year-old female .  Her complaint is pain within the neck extending in the left arm.  She also has pain across the lumbar spine.  The patient feels like the neck pain is more problematic than the back pain.  The neck and arm pain are equal, 50% of each area causing her symptoms in the neck and the arm.  Her back pain started in the late 1990s, her neck pain started in 08/2002.  She feels the neck pain was caused by a car accident.  The car accident did exacerbate her back pain, which she had problems prior to that. The patient describes a constant pain that can be burning, stabbing, aching and sharp in nature.  Aggravating factors are activity.  Alleviating factors are medication, topical heating patches, stretching.  Her pain can be anywhere from a 3-7 on a 0-10 scale.

TESTING: Has had recent MRIs of both the cervical and lumbar spine.  The patient did have electrodiagnostic studies in 2007.

TREATMENTS: The patient has been seen in the Pain Clinic previously by Dr. Culling.  This was in 05/2004.  He felt most of her symptoms at that point were due to a fibromyalgia-type picture. He recommended exercise and referred her to our

psychologist, Dr. Klein.  The patient has been working with Dr. Ernest Dole most recently with medication management.  She is on methadone, oxycodone, Soma and gabapentin.  She has been through physical therapy in the past, but does not demonstrate much in the way of home exercise program.  She did have treatments with Dr. Gelinas around the late 1990s, early 2000.  He did facet injections in the lumbar spine, which gave her about two weeks relief.  She also had an IDET procedure, which was somewhat beneficial.  Acupuncture was of no benefit.  Chiropractic care seemed to exacerbate things.

MEDICATIONS: Levothyroxine, methadone 20 mg four times a day, oxycodone 10 mg four times a day, Soma 350 mg four times a day, gabapentin 600 mg three times a day.  Ambien 10 mg at night.

PHYSICAL EXAMINATION:

VITAL SIGNS: Blood pressure is 133/83.  Pulse is 94.  The patient is 5 feet 7 inches tall and weighs 195 pounds.

GENERAL: This is an overweight female who is in no distress while seated. She arises easily to a standing position.  Her gait is mildly antalgic.
NEUROLOGIC: Motor and sensory are grossly intact in all four extremities.

IMPRESSION:
1.      Cervical spondylosis without myelopathy.
2.      Cervical disk displacement without myelopathy.
3.      Lumbar spondylosis without myelopathy.
4.      Myofascial pain secondary to the above diagnosis.

PLAN:
1.      The patient will be encouraged to continue with Dr. Dole for medication management.
2.      The patient will be referred to Physical Therapy to work on exercise program she can do at home for the neck and lumbar areas.
3.      The patient will be set up for a cervical epidural steroid injection.
4.      We will follow up in several weeks with medial branch blocks of the lumbar spine.

*Id.*

On April 2, 2008, Dr. Malizzo evaluated Peters, noting:

HISTORY OF PRESENT ILLNESS: The patient returns to clinic today.  Her chief complaint is pain within the cervical spine extending all the way down the left arm.  She is here today for trial of cervical epidural steroid injection.  <u>She has had an MRI which demonstrated degenerative changes at C5-C6 and C6-C7.  This was causing</u>

some cord flattening and impingement upon the ventral nerve roots.  The patient
does not take blood thinners, has no allergies to local anesthetic, contrast or steroid
that she is aware of.

Tr. 279 (emphasis added).  Dr. Malizzo scheduled Peters for medial branch blocks of the lumbar

spine in two weeks.

On April 16, 2008, Dr. Malizzo evaluated Peters, noting:

HISTORY OF PRESENT ILLNESS: The patient returns clinic today.  Her chief
complaint is pain across the low back, particularly right of midline.  The patient is
her today for trial of medial branch blocks.  We saw her 2 weeks ago and did a
cervical epidural injection, this has helped dramatically with her arm pain, but she
[is] still having neck pain.  She was also referred to Physical Therapy, has had the
initial evaluation, but has not done any therapy today.  The patient does not take
blood thinners and had no adverse reaction with previous injections.

Tr. 278 (emphasis added).  Dr. Malizzo directed Peters to contact the clinic and let them know

what benefit she had in her low back pain.  Dr. Malizzo also encouraged Peters to "follow

through with the Physical Therapy for cervical spine."  *Id.*

On April 30, 2008, Dr. Malizzo evaluated Peters, noting:

HISTORY OF PRESENT ILLNESS: The patient returns to clinic today.  Her chief
complaint is pain across the back.  She is here today to repeat a medial branch.  She
had these done and got 90% relief for about a day.  She presently rates her pain 5/10.
She has had no adverse reaction from the first set of injections.  She does not take
blood thinners.

Tr. 277 (emphasis added).  Dr. Malizzo administered a bilateral L3 through L5 medial branch

block.  Dr. Malizzo directed Peters to contact the clinic "in the next several days to know what

percentage of her pain went away and for what extent of time."  *Id.*

On June 4, 2008, Dr. Malizzo evaluated Peters and noted:

HISTORY OF PRESENT ILLNESS: The patient returns to clinic today.  Her chief
complaint is pain across the lumbar part of her back.  The patient is here today for

radiofrequency of the bilateral L3 through L5 medical branches.  The patient has had a medial branch block twice, both of these provided her with greater than 80% relief for a time consistent with local anesthetic.

Tr. 276.  Dr. Malizzo directed Peters to follow up in the clinic as needed.  Tr. 276.

On July 7, 2008, Dr. Malizzo evaluated Peters and noted:

HISTORY OF PRESENT ILLNESS: The patient returns to clinic today.  Her chief complaint is pain across the low back.  At times, it will radiate down her legs, but the back pain is by far the most problematic.  She rates the pain between a 6-7 on a 0-10 scale.  The patient did have 2 medial branch blocks of the lumbar spine.  These have worked well for her.  We did the radiofrequency procedure about a month ago, unfortunately; the patient does not have a very good response with this.  The patient does see Dr. Dole.  She is using methadone, oxycodone, Soma, and gabapentin to control her symptoms.  These do help some, but as stated above, her pain is still between 6-7 on a 0-10 scale.  The patient is here today to discuss other treatment options for her back.  When asked what type of exercise the patient is doing, she is not doing much even though she did go through physical therapy.  She did state that the TENS unit therapy was beneficial for her.

IMPRESSION:     1) Lumbar spondylosis withouth myelopathy; (2) lumbar disc displacement without myelopathy.

Tr. 273.  Dr. Malizzo discussed starting a home exercise program with Peters and the benefits of exercising to keep the muscles of the back, abdomen and pelvic area strong.  Dr. Malizzo also discussed the use of the TENS unit and trying a lumbar epidural steroid injection.  Peters was willing to have one.

On July 10, 2008, Dr. Malizzo administered a lumbar epidural steroid injection.  Tr. 271-272.  Dr. Malizzo noted:

The patient returns to clinic today.  Her chief complaint is pain across the low back.  She is here today for lumbar epidural steroid injection.  We trialed her with medical branch blocks.  She did get significant short-term benefit.  When we did the radiofrequency procedure she got absolutely no long-term relief.  The patient presently rates her pain 6/10.  She does not take blood thinners nor has she had an adverse reaction when we have done the injection in the past.

26

Tr. 271 (emphasis added).  Dr. Malizzo directed Peters to contact him in 2-3 weeks to let him know how the injection had worked for her.

On April 9, 2009, Peters returned for a follow up with Dr. Malizzo.  Tr. 355-356.  Dr. Malizzo administered a lumbar epidural steroid injection.  Tr. 355.

On June 11, 2009, Peters returned for a follow up with Dr. Malizzo.  Tr. 351-352.  Dr. Malizzo administered a cervical and lumbar epidural steroid injection.  Dr. Malizzo directed Peters to return in 2 months to repeat the injection.

On August 6, 2009, Peters returned for a follow up with Dr. Malizzo.  Tr. 346-348.  Dr. Malizzo administered a cervical and lumbar epidural steroid injection, interlaminar C6-C7.  Tr. 346.

On October 1, 2009, Peters returned for a follow up with Dr. Malizzo.  Tr. 339-340.  Dr. Malizzo noted, "The patient has degenerative changes to both cervical and lumbar spine.  Epidural injections do provide her with some benefit lasting a full 2 months.  She is here today to repeat the injection.  Her pain is rated 6 on a 0-10 scale." Tr. 344.  Dr. Malizzo administered (1) a cervical epidural steroid injection, interlaminar C7-T1 and (2) a lumbar epidural steroid injection, interlaminar L4-L5.  Dr. Malizzo directed Peters to return in w-3 months to repeat the injections.

On December 1, 2009, Peters returned for a follow up with Dr. Malizzo.  Tr. 333-334.  Dr. Malizzo noted:

> Ms. Peters returns to clinic today.  Her chief complaint is pain to the cervical and lumbar spine.  In the cervical spine extends left of midline and the shoulder blade area and the back of the head. In the lumbar spine extensor.  The hips and buttocks bilaterally and most recently into the groin on the right side.  The patient rates her pain 5 on a 0-10 scale.  The patient is here today to repeat the cervical and lumbar

epidural steroid injections.   The patient has had no adverse reaction with these injections and does not take blood thinners.

Tr. 333(emphasis added).  Dr. Malizzo administered a cervical epidural steroid injection,

interlaminar C7-T1 and a lumbar epidural steroid injection interlaminar, L4-L5.  *Id.*  Dr. Malizzo

directed Peters to return for a follow up in 2-3 months for repeat injections.  Tr. 334.

In evaluating Peters's complaints of pain, the ALJ noted:

After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a full range of less than sedentary work as defined . . . with the following limitations: She is limited to work that involves making only simple work related decisions with few work place changes, and limited to work that requires no production rate pace.

In making this finding, I have considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence based on the requirements of 20 C.F.R. 404.1529 and 416.929 and SSRs 96-4p and 96-7p.  I have also considered opinion evidence in accordance with the requirements of 20 C.F.R. 404.1527 and 416.927 and SSRs 96-2p, 96-5p, 96p and 96-3p.

In considering the claimant's symptoms, I must follow a two-step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s), i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques– that could reasonably be expected to produce the claimant's pain or other symptoms.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, I must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functioning. For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, I must make a finding on the credibility of the statements based on a consideration of the entire case record.

Tr. 17-18.  The ALJ then set forth Peters's testimony regarding the severity of her pain, her

activities of daily living, and the medical evidence.

The inability to work pain-free is not sufficient reason to find a claimant disabled. *Gossett v. Bowen*, 862 F.2d 802, 807 (10th Cir. 1988).  "To be disabling, pain must be so severe, by itself or in conjunction with other impairments, as to preclude any substantial gainful employment."  *Brown v. Bowen*, 801 F.2d 361, 362-63 (10th Cir. 1986).  The ALJ properly examined the medical record and found Peters's pain did not rise to this level.   This finding is supported by substantial evidence.  Moreover, the record shows that none of Peters's treating physicians reported that her pain was disabling.

Peters also states, "The side effects of her medication include sleepiness, dizziness and a foggy mind."  Pl.'s Mem. Support Mot. Remand at 19.  However, a review of Dr. Dole records indicate Peters generally reported she was not having any "adverse effects" or "no side effects" from her medications.  The few times Peters reported side effects was when she was transitioning from one medication to another.  Peters consistently requested no changes to her medications.

Peters also contends the ALJ failed to do a *Luna* analysis in evaluating her allegations of disabling pain.  *See Luna v. Bowen*, 834 F.2d 161, 163–64 (10th Cir.1987) (setting out analysis to be followed when evaluating pain).  The Court disagrees.  The ALJ conducted the three-part analysis prescribed in *Luna.*  The ALJ discussed all three requirements in the Luna analysis: whether a pain-producing impairment existed; whether there was a loose nexus between the impairment and her allegations of pain; and whether her pain was in fact disabling.  *See Harper v. Astrue*, 2011 WL 2580336, *5, (10th Cir. June 30, 2011)(unpublished).

**D.  Crediblility Determination**

"Credibility determinations are peculiarly the province of the finder of fact, and we will not upset such determinations when supported by substantial evidence."  *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir.1995).  After examining the record as a whole, the court finds that the ALJ's credibility findings are closely and affirmatively linked to substantial evidence.

The ALJ found,

> After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are not inconsistent with the above residual functional capacity assessment.

Tr. 20.  Thus, the ALJ found Peters's allegations of pain credible but not disabling.  The ALJ cited to Peters's medical records and Dr. Burger's consultative evaluation which support a finding that Peters's allegations of disabling pain were not credible.[6]

**E.  RFC Determination**

Residual functional capacity is defined as "the maximum degree to which the individual retains the capacity for sustained performance of the physical-mental requirements of jobs."  20 C.F.R. Pt. 404, Subpt. P, App. 2, §200.00(c).  In arriving at an RFC, agency rulings require an ALJ to provide a "narrative discussion describing how the evidence supports" his conclusion. *See* SSR 96-8p, 1996 WL 374184, at *7.  The ALJ must "discuss the individual's ability to perform sustained work activities n an ordinary work setting on a regular and continuing basis . .

---

[6] Peters also alleges Dr. Burger is "biased against claimants."  Pl.'s Mem. Support Mot. Reverse at 13.  In support of her allegation, Peters submitted several Disability Determination Examinations Dr. Burger performed on other claimants. *See* Tr. 382-409.  Peters's challenge to Dr. Burger's objectivity should have been brought to the agency's attention or to the ALJ at the administrative hearing, as the agency and the ALJ are in a better position to determine whether an agency consultant is bias.   Accordingly, the Court will not opine on this matter.

. and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the record." *Id.* The ALJ must also explain how "any material inconsistencies or ambiguities in the case record were considered and resolved." *Id.*

In her decision, the ALJ found Peters retained the RFC to perform a full range of less than sedentary work with the following limitations: She is limited to work that involves making only simple work related to decisions with few work place changes and limited to work that requires no production rate pace. Tr. 17. Peters contends the ALJ's RFC finding is not supported by substantial evidence because the ALJ did not adequately evaluate her subjective complaints such as side effects of medications, depression, inability to use both hands, and the effects of fibromyalgia. Pl.'s Mem. Support Mot. Remand at 22.

The Court already noted above that Dr. Dole's records indicate Peters consistently reported she was having no side effects or adverse affects to her medications and consistently requested Dr. Dole make no changes. Additionally, the Court has addressed the issue of Peters's allegations regarding fibromyalgia and her allegations of carpal tunnel and will not address these again. The ALJ's RFC did consider her pain and her depression. Finally, Dr. Burger's evaluation and Dr. Green's RFC and Peters's medical records support the ALJ's RFC. Thus, the ALJ's RFC is supported by substantial evidence.

## F.  Hypothetical Question to VE

"Testimony elicited by hypothetical questions that do not relate with precision all of a claimant's impairments cannot constitute substantial evidence to support the [Commissioner's] decision." *Hargis v. Sullivan*, 945 F.2d 1482, 1492 (10th Cir. 1991). However, hypothetical

questions to a VE need only include impairments which are supported by substantial evidence. *Anderson v. Shalala*, 1993 WL 261905 (10th Cir. 1993) (unpublished).

Peters contends the ALJ erred when she "omit[ted] medication from the hypothetical." Pl.'s Mem. Support Mot. Remand at 23.  Peters also contends the ALJ erred when she failed to include her depression in her hypothetical question to the VE.  Finally, Peters claims her counsel cross-examined the VE and added to the ALJ's hypothetical that she "was unable to attend to task and concentrate for **two hours**."  *Id.*  This statement is incorrect.  The record reflects that counsel asked the VE "sticking with the hypothetical which the judge presented to you, if we add to that the same person is unable to attend– or is able to attend only for **half an hour**."  Tr. 60. In response to counsel's hypothetical, Peters contends the VE eliminated all identified positions. However, an ALJ is bound only by vocational testimony regarding impairments she has accepted as true.  *Talley v. Sullivan*, 908 F.2d 585, 588 (10th Cir. 1990).   Moreover, counsel's included a limitation not supported by the record.  The ALJ's hypothetical to the VE encompassed all limitations supported by the record.

**G.  Conclusion**

The Court's review of the ALJ's decision, the medical record, and the applicable law indicates that the ALJ's decision adheres to applicable legal standards and that substantial evidence supports the ALJ's determination that, despite her limitations, Peters could perform a significant number of jobs that exist in the national economy, and was therefore not disable under the Social Security Act. .

A judgment in accordance with this Memorandum Opinion will be entered.



_____

**DON J. SVET**
**United States Magistrate Judge**